# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**MICHAEL SOH,**<br><br>Defendant. | Case No.<br><br>**VIOLATION:**<br>**18 U.S.C. § 1349 (Conspiracy to Commit Health Care Fraud)**<br><br>**FORFEITURE:**<br>**18 U.S.C. § 982(a)(7); 28 U.S.C. § 2461(c)**<br><br><u>**UNDER SEAL**</u> |

## INFORMATION

The United States of America charges that:

### BACKGROUND

At all times material to this Information:

#### D.C. Medicaid and Behavioral Health Regulatory Framework

1. Medicaid was a health insurance program established by Congress under Title XIX of the Social Security Act of 1965. In the District of Columbia (D.C.), Medicaid was jointly funded by the federal and D.C. governments. Medicaid provided health insurance coverage to D.C. residents whose incomes were below a certain financial threshold. Recipients of medical services covered by Medicaid were referred to as "beneficiaries." Medicaid was a "health care benefit program" as defined in 18 U.S.C. § 24(b) and a "Federal health care program" as defined in 42 U.S.C. § 1320a-7b(f). Under Medicaid, only medically necessary services were authorized to be reimbursed.

2. In Washington D.C., behavioral health services were administered by the D.C. Department of Behavioral Health ("DBH"). As the primary mental health authority in D.C., DBH

was responsible for implementing and overseeing D.C.'s Mental Health Rehabilitative Services ("MHRS") program, a program covered by Medicaid. MHRS services were intended to assist eligible beneficiaries navigate and alleviate the impact of mental and behavioral health issues. Beneficiaries who received MHRS were often referred to as "consumers."

3. Under the MHRS program, Medicaid covered and reimbursed standard behavioral health services, such as Community Support services. Community Support services included, among other things, assistance and support for mental-health consumers in stressor situations, individual mental health interventions, assistance with increasing social support skills to enable consumers to ameliorate life stresses, and the development of mental health relapse prevention strategies. Community Support services were provided by a consumer's Community Support Worker ("CSW") under the auspices of a certified Medicaid Provider known as a Core Services Agency ("Provider").

4. Medicaid also provided reimbursement for certain types of specialty MHRS services, including the Assertive Community Treatment ("ACT") program. The ACT program provided intensive, integrated services to adults with an "intractable, serious, and persistent mental illness with a diagnosis of either Axis I or Axis II from the DSM-IV." To assess candidates for inclusion in the ACT program, Providers were required to conduct a multi-axial diagnosis of the consumer's medical condition, a psychosocial summary, and a level of care utilization system ("LOCUS") assessment. Only consumers with a LOCUS score of 20-22 or higher during an initial assessment were eligible for ACT services. In order to exit or be "stepped down" from the ACT program, Providers were likewise required to conduct a LOCUS assessment to ensure the consumer no longer required the heightened level of care contemplated by the ACT program.

5. In D.C., MHRS encounters with consumers were billed in "units," which were equivalent to 15 minutes of time providing services to a consumer. DBH regulations required the actual start and stop time of MHRS encounters to be used to calculate the duration of the service. For purposes of reimbursement, Medicaid authorized service encounters exceeding seven minutes to be rounded to the nearest whole unit.

6. Because the ACT program was intended to provide intensive, wrap-around services to consumers with the most severe mental and behavioral health issues, Medicaid authorized Providers to submit reimbursable encounter notes more frequently for ACT consumers. Until November 2021, Medicaid authorized Providers to bill 200 units every 180 days for standard MHRS encounters. By contrast, Medicaid authorized Providers to bill 600 units every 180 days for ACT services. In November 2021, Medicaid increased the amount of units Providers were authorized to bill for MHRS encounters from 200 units to 600 units every 180 days.

7. Providers were required to maintain up-to-date records and to accurately document all MHRS encounters billed under the Provider's electronic medical records ("EMR") system. In D.C., Providers typically used an EMR platform called Credible. In order to be reimbursed by Medicaid for MHRS services provided to consumers, CSWs were required to document the service in Credible by inputting clinical encounter notes that included, among other information, consumer information, treatment notes, and dates and times of service. CSWs were authorized to conduct MHRS encounters in several ways, including in the office or in-person. In response to the COVID pandemic, in or about March 2020, DBH authorized Providers to conduct MHRS encounters by telehealth. A "tele" visit indicated a telephonic or virtual encounter with a consumer. CSWs were required to validate the accuracy and authenticy of the services by signing their names electronically in Credible. Once a CSW submitted an encounter note into Credible for

reimbursement, Providers were required to review the notes for accuracy and approval prior to submission to Medicaid for reimbursement.

8. Providers, as well as all employees of Providers, including CSWs, were required to know, understand, and follow all federal and local laws, including Medicaid rules and regulations applicable in Washington D.C.

### Relevant Entities and Individuals

9. PRESTIGE HEALTHCARE RESOURCES ("PRESTIGE") was a Medicaid Provider headquartered at 1418 Good Hope Road SE in Washington D.C. At all relevant times, PRESTIGE was authorized to provide MHRS services to Medicaid beneficiaries in Washington D.C. On February 25, 2020, PRESTIGE was approved by DBH to implement an ACT Program.

10. AFFORDABLE HOME HEALTHCARE LLC ("AFFORDABLE") was a Medicaid Provider headquartered at 7826 Eastern Ave NW, Unit 411, Washington, D.C. At all relevant times, AFFORDABLE was authorized to provide MHRS services to Medicaid beneficiaries in Washington D.C. AFFORDABLE was not authorized by DBH to provide ACT services to consumers.

11. At all relevant times, CO-CONSPIRATOR 1 was a resident of Bowie, Maryland, and Fort Lauderdale, Florida. CO-CONSPIRATOR 1 became the CFO of PRESTIGE in 2019. In his role as CFO, CO-CONSPIRATOR 1 worked closely with Michele N. Mba ("MBA") regarding billing for MHRS services and the implementation of the ACT Program. As part of his duties, CO-CONSPIRATOR 1 submitted, or caused to be submitted, claims to Medicaid for reimbursement.

12. At all relevant times, MBA, a licensed Nurse Practitioner, was a resident of Baltimore, Maryland. In 2015, MBA was hired by PRESTIGE and, in or about February 2020,

appointed to be the ACT Program Coordinator at PRESTIGE. As part of her duties, MBA submitted, or caused to be submitted, claims to Medicaid for reimbursement.

13. In the course of the conspiracy, CO-CONSPIRATOR 1 and MBA exercised oversight over multiple CSWs (the "the CSW Co-Conspirators"). Defendant SOH worked as a CSW at PRESTIGE beginning in or about April 2020. In his role as a CSW, SOH submitted, or caused to be submitted, claims to Medicaid for reimbursement.

14. In her role as a nurse practitioner, MBA submitted clinical encounter notes for services she allegedly performed on behalf of MHRS consumers. MBA also reviewed and approved encounter notes for MHRS services allegedly performed by CSWs working under her supervision. Once MBA approved the CSW notes in Credible, CO-CONSPIRATOR 1 batched the notes for submission to Medicaid for reimbursement.

15. In or about March 2020, MBA became the ACT Program Director at PRESTIGE. As the ACT Program Director, MBA worked closely with CO-CONSPIRATOR 1 to implement the ACT Program. In order for a consumer to receive ACT services, the Provider was required to certify that the required assessments had been completed, including LOCUS scores, and that a consumer met the criteria to be eligible for ACT services.

16. In or about April 2021, CO-CONSPIRATOR 1, MBA, and multiple CSWs transferred from PRESTIGE to AFFORDABLE. CO-CONSPIRATOR 1, MBA, and the CSW Co-Conspirators, except SOH, worked at AFFORDABLE until approximately December 2022. Although SOH did not transfer to AFFORDABLE in April 2021 along with the other CSW CO-Conspirators, in or around January 2022, he accepted employment with a business entity formed by CO-CONSPIRATOR 1, where he worked under the supervision of CO-CONSPIRATOR 1 and alongside the CSW CO-Conspirators until at least December 2022.

17. Given their roles at PRESTIGE and later at AFFORDABLE, CO-CONSPIRATOR 1 and MBA were responsible for training the CSW Co-Conspirators on MHRS billing standards promulgated by Medicaid, as well as documentation of MHRS encounters required by Medicaid.

18. By submitting encounter notes into Credible and to Medicaid for reimbursement, CO-CONSPIRATOR 1, MBA, and the CSW Co-Conspirators were required to certify that the services were medically necessary and had been performed as documented in the encounter notes.

## COUNT ONE
### (Conspiracy to Commit Health Care Fraud)

19. The allegations contained paragraphs one through 18 are realleged and incorporated as if fully set forth in this paragraph.

20. From in or about February 2020 and continuing through in or about December 2022, in the District of Columbia and elsewhere, the defendant MICHAEL SOH did knowingly and intentionally conspire and agree with others to knowingly and willfully execute and attempt to execute a scheme and articifice to defraud a health care benefit program, as defined in Title 18, United States Code, Section 24(b), namely, Medicare and Medicaid, and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of Medicare and Medicaid, in connection with the delivery of and a payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1349.

### Purpose of the Conspiracy

21. The purpose of the conspiracy was for defendant SOH and others to unjustly enrich themselves by submitting or causing the submission of false and fraudulent claims to federal health care benefit programs.

### Manner and Means of the Conspiracy

6

22. CO-CONSPIRATOR 1, MBA, and the CSW Co-Conspirators, including SOH, falsely certified that multiple MHRS consumers at PRESTIGE were eligible to receive ACT services when, in fact, the ACT services were not medically necessary.

23. CO-CONSPIRATOR 1, MBA, and the CSW Co-Conspirators, including SOH, submitted false and fraudulent MHRS clinical encounter notes to Medicaid for reimbursement, including MHRS encounter notes that (1) grossly inflated the amount of time spent conducting services; (2) were based on services not authorized to be reimbursed by Medicaid; and (3) were based on MHRS encounters that did not occur.

24. CO-CONSPIRATOR 1 and MBA instructed the CSW Co-Conspirators, including SOH, to utilize all 600 units for a consumer—the total amount of units authorized by Medicaid for a consumer during a 180-day period—without regard to medical necessity and without regard to whether the services had actually been performed.

25. Acting under the direction of and with the approval of CO-CONSPIRATOR 1 and MBA, the CSW Co-Conspirators, including SOH, submitted telehealth encounter notes for "collateral services," which included time spent waiting for consumers, driving to meet with consumers, picking up prescriptions for consumers, or coordinating food deliveries for consumers.

26. CO-CONSPIRATOR 1 and MBA coached the CSW Co-Conspirators on ways to write encounter notes, including by inputting false and fraudulent information about an encounter, so as to avoid scrutiny by DBH. CO-CONSPIRATOR 1 and MBA likewise condoned the CSW Co-Conspirators' use of template or "cut and paste" notes. MBA and CO-CONSPIRATOR 1 ignored multiple instances of fraudulent encounter notes submitted by CSWs under their supervision, including false encounter notes submitted on behalf of deceased consumers or consumers who had not been seen by their CSW in months.

**(Conspiracy to Commit Health Care Fraud, in violation of 18 U.S.C. § 1349)**

## FORFEITURE ALLEGATION

1. Upon conviction of the Federal health care offense alleged in Count 1 of this Information, defendant SOH shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, which constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of such offense.

2. If any of the property described above as being subject to forfeiture, as a result of of any act or omission of the defendant:

    (a)   cannot be located upon the exercise of due diligence;

    (b)   has been transferred or sold to, or deposited with, a third party;

    (c)   has been placed beyond the jurisdiction of the Court;

    (d)   has been substantially diminished in value; or

    (e)   has been commingled with other property which cannot be subdivided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b) and 28 U.S.C. § 2461(c).

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By: _____
CHRISTOPHER R. HOWLAND (DC 1016866)
Assistant United States Attorney
Fraud, Public Corruption, & Civil Rights Section
U.S. Attorney's Office for Washington D.C.
601 D Street N.W.
Washington, D.C. 20530

(202) 252-7106
Christopher.Howland@usdoj.gov

9